UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE LEWIS SHEHAN, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:15-cv-1315 (MPS) |
| | : | |
| WARDEN ERFE, et al., | : | |
| Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Joe Lewis Shehan, commenced this civil rights action against correctional officers at the Corrigan-Radgowski Correctional Center ("Corrigan").  He asserted claims of excessive force, deliberate indifference, denial of due process, negligence, assault, and battery arising from his confinement in restraints following an incident at Corrigan in November 2014.  In earlier rulings, the Court dismissed all except the following claims: (1) deliberate indifference claims against defendants Norfleet, Ruggiero, and Clapper; (2) an excessive force claim against defendants Marten, Erfe, Williams, Champion, Conger, Norfleet, and Ruggiero; and (3) state law claims for assault and battery against defendants Norfleet and Ruggiero.  The defendants have filed a motion for summary judgment addressing the remaining claims.  For the reasons that follow, the defendants' motion is granted in part and denied in part.

I.  **Legal Standard**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(a), Fed. R. Civ. P.; *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009).  The moving party may satisfy his burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support

the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat the motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

## II.   <u>Facts</u>

The following facts are undisputed unless otherwise indicated.[1]

A.   *The Plaintiff's Familiarity with the Grievance System*

The plaintiff was first admitted to the Connecticut Department of Correction ("DOC") in 1988. Over the next ten years, the plaintiff was discharged and readmitted to custody several times. He also was transferred between Connecticut correctional facilities many times. On January 5, 2001, the plaintiff was admitted to custody for his current term of incarceration and has since been transferred between correctional facilities multiple times.

---

[1] The facts are taken from the defendants' Local Rule 56(a) Statement and the exhibits submitted by both parties. Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement containing separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. Each denial must cite an affidavit or other admissible evidence. L. Civ. R. 56(a)(3). The plaintiff was informed of this requirement. (ECF No. 59-19.) Although he filed a Local Rule 56(a)(2) Statement denying some of defendants' statements and admitting others, he provided no citations to support his denials. Thus, his statement is insufficient to oppose defendants' Local Rule 56(a)(1) Statement, and the defendants' statements are generally deemed admitted. *See* D. Conn. L. Civ. R. 56(a)(1) ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2."). Because the plaintiff is pro se, however, the Court will make a narrow exception to this ruling: The Court will not deem admitted statements in the Local Rule 56(a)(1) Statement that are (1) denied by the plaintiff, (2) within the plaintiff's personal knowledge (i.e., such that his denial could be supported by competent testimony from him), and (3) not supported by admissions in the Plaintiff's deposition testimony.

During readmission and transfers, the plaintiff received inmate orientation.  As part of the

orientation process, the plaintiff received booklets or pamphlets that explained the prison grievance

system.  Upon transfer to the MacDougall-Walker Correctional Institution in 2006, the plaintiff received

an Inmate Handbook that contained a section explaining inmate grievance procedures.  There is

evidence that the plaintiff had filed at least one inmate grievance before the incident underlying this

action, although the plaintiff disputes this and the Court will treat it as a disputed issue.[2]  *See* note 1,

*supra*.

      B.    *The November 12, 2014 Incident*

On November 12, 2014, Correctional Officer Hamilton observed the plaintiff assaulting and

fighting with his cellmate in their cell at Corrigan.  When Officer Hamilton called for assistance, the

plaintiff covered the cell window with toilet paper.  Defendant Champion arrived at the cell with other

officers and ordered the plaintiff to uncover the window.  The plaintiff refused and began to yell

profanities through the cell door.  Defendant Champion could hear the two inmates whispering to each

other.  Officer Hamilton reported that it appeared that the two inmates were staging the fight.  Defendant

Conger attempted verbal intervention without success.  Defendant Champion then ordered both inmates

to approach the cell door so that restraints could be applied.  Both inmates refused to comply.  Again,

Defendant Champion heard the inmates whispering to each other.  Defendant Champion disbursed a

chemical agent under the cell door and tried to open the door to secure the inmates.  She was

unsuccessful.  A clinical social worker and a nurse also attempted verbal intervention.  They were

---

[2] In his deposition, the plaintiff initially testified that he recalled filing a grievance about a recreational situation at Corrigan, but then that "I am not sure I did file a grievance on that."  (ECF No. 59-4 at 12-13.)  The Defendant also submitted what appears to be a grievance filed by the plaintiff on August 5, 2014, but there is no citation showing whether the plaintiff acknowledged the authenticity of this document or that the August 5, 2014 grievance was indeed filed by him.  (ECF No. 59-9.)

unsuccessful.  "The inmates may have tampered with the locking mechanism on the door."  (ECF No. 59-2.)

      Two cell extraction teams assembled and the plaintiff was again ordered to exit the cell.  He was warned that the chemical agent would again be deployed if he failed to comply with the order.  Both inmates refused to comply.  Defendant Champion disbursed another burst of chemical agent under the door.  When this was unsuccessful, defendant Champion deployed a third burst of chemical agent.  After the third deployment, the inmates complied.  They were secured and removed from the cell.  The plaintiff received disciplinary reports for assault, impeding an order, and hostage-taking.  He also was arrested by the Connecticut State Police on charges of assault, unlawful restraint, reckless endangerment, and failure to submit to fingerprints.

      After he was removed from the cell, the plaintiff was escorted to the medical unit where he was decontaminated from the chemical agent.  He also was given medical and mental health examinations for medical approval before being placed in restrictive housing.  The plaintiff refused to answer any questions.  As a result, he was not approved for placement in restrictive housing.  The plaintiff was confined in cell 113 in the medical unit to mitigate any possible self-harm.

      C.    *Plaintiff's Confinement in In-Cell Restraints*

      In the medical unit, the plaintiff was required to participate in the routine strip search protocol under Administrative Directive 6.7.  This directive requires an inmate to undergo a strip search before the inmate is placed in restrictive housing or if the inmate has been involved in a significant incident.  *See* Defs' Ex. E, Doc. 59-7, Directive 6.7, Section 7(A)(6) and (7).  The plaintiff had participated in a significant incident and was slated for confinement in restrictive housing, so the strip search was required.

The plaintiff refused to bend at the waist and spread his buttocks.  Instead, he wanted to squat and cough.  Directive 6.7, Section 3(Q) requires a visible inspection of the rectum.  The parties dispute whether the rectum can be visibly inspected when the inmate squats and coughs.  When an inmate refuses to comply with a strip search, as defined in Directive 6.6 Section 3(Q), correctional staff may either conduct a hands-on controlled strip search under Directive 6.7, Section 7(D), or use in-cell restraints under Directive 6.5, Section 8(A)(4).  In-cell restraints may be used to "ensure compliance with an order" and "to maintain order, safety and security."  Directive 6.5, Section 8(A)(4).  Shift supervisors may use in-cell restraints for any reason set forth in Section 8(A).  Directive 6.5, Section 8(B)(1).

In-cell restraints may include one or more of the following: handcuffs, leg irons, flex cuffs, a "black box," a waist chain, and a tether chain.  The inmate is handcuffed with his hands in front.  His ankles are secured by leg irons.  A tether chain connects the two with sufficient slack to enable the inmate to stand erect.  The black box fits over the handcuffs and covers the keyholes to prevent the inmate from picking the locks.  It forms a rigid link between the inmate's wrists.  In-cell restraints cannot be used as a punitive measure.  Once the restraints are applied, the inmate must be checked every fifteen minutes with observations recorded.  The shift commander must observe the inmate at least twice per shift and medical staff must observe the inmate and conduct a mental health assessment at least twice per day.  Inmates are able to feed themselves and use the toilet while restrained.

A hands-on controlled strip search frequently results in an explosive situation and exposes staff to injury.  In this case, the officers decided to use in-cell restraints instead.

The following facts are supported by evidence submitted by defendants but disputed by the plaintiff.  *See* note 1, *supra*.  The officers placed the plaintiff in a safety gown and in-cell restraints in

5

medical unit cell 113.  After the officers applied the restraints, Nurse Martin checked the restraints in accordance with the restraint protocol.  When Nurse Martin determined that the right wrist restraint was too tight, the restraint was adjusted.  An officer was posted at the plaintiff's door for continuous observation.  Nurse Martin later observed that the restraints had been properly applied and allowed for appropriate circulation and motion.

The plaintiff admits that he was confined and shackled in in-cell restraints from 7:15 p.m. on November 12, 2014, until 2:25 p.m. on November 14, 2014.  He denies that, during this time, his restraints were checked every fifteen minutes or that he was offered several opportunities to be released from restraints if he would agree to undergo the strip search protocol.  He admits, however, that he refused all offers, stating, "I am not bending over for anyone."  (ECF No. 59-2, ¶ 31.)

The following facts are supported by evidence submitted by defendants but disputed by the plaintiff. On November 13, 2014, the plaintiff was observed standing and adjusting his restraints.  There are numerous entries in the plaintiff's medical records for November 13 and 14, 2014, indicating that medical staff checked on the plaintiff.  On November 14, 2014, at 7:00 a.m., medical records first note mild swelling around the plaintiff's wrists.  At 9:35 a.m., defendant Conger adjusted the plaintiff's restraints.  Following this adjustment defendant Nurse Clapper checked the restraints in response to the plaintiff's complaints and noted no swelling.  The plaintiff alleges that he complained of swelling in his wrists numerous times and that custody and medical staff did not check the restraints for over thirty hours.  The plaintiff contends that his body type prevented him from being able to eat or use the toilet while restrained.

When the plaintiff was removed from in-cell restraints, he was readied for transport to Northern Correctional Institution.  The video recording of his removal from restraints shows the plaintiff smiling

6

and joking with no complaints of injury to his wrists.  The video shows no signs of swelling, cuts, or bruises.  Although the plaintiff contends the restraints on his wrists concealed the injuries, he was not wearing restraints during the entire video and the Court is not required to credit his contention for summary judgment purposes.  *Scott v. Harris*, 550 U.S. 372, 379 (2007) (refusing to credit non-movant's assertions for summary judgment purposes where they were "blatantly contradicted" by video evidence).  The plaintiff also alleges that he decided not to complain any longer about a situation over which he had no control.  Upon his arrival at Northern Correctional Institution, the plaintiff was examined by medical staff.  He expressed no medical complaints.  In this action, the plaintiff alleges that the use of the in-cell restraints caused him to suffer permanent damage to his radial nerve with no feeling in the first three fingers of his left hand and loss of grip strength.

D.    *Use of the Black Box*

According to an affidavit submitted by the defendants, gaining compliance with a strip search is important when the inmate is involved in a significant prison disturbance that may be drug-related or the inmate may have secreted drugs or a weapon in his crotch or anal area.  The defendants considered it possible that the plaintiff had secreted drugs, a weapon, or a handcuff key in his rectum.  The use of in-cell restraints with the black box prevented the plaintiff from being able to access contraband secreted in his rectum.  In addition, even if the plaintiff could access a handcuff key, the black box would prevent access to the handcuff keyholes.  Even though the plaintiff was confined alone in a cell, the restraints would prevent him from engaging in self-harm or endangering correctional staff when they entered the cell.  Although the plaintiff denies these assertions about the general need for the use of in-cell restraints and the black box in situations such as these, he has submitted no admissible evidence to contradict them.  *See* note 1, *supra*.  He argues, however, that this rationale was pretextual as in his case he was

7

confined in a cell with an officer stationed at the window observing him at all times.

        E.    *Plaintiff's Grievance*

        In a grievance dated November 22, 2014, and filed while the plaintiff was at Northern

Correctional Institution, the plaintiff made the following complaint about the use of in-cell restraints at

Corrigan from November 12 through 14, 2014:

> I was held in Corrigan, C.I. in the medical unit on in-cell [restraint] status on 11-12-14 time 6:28pm until 11-14-14 time 4:00pm, for refusing to comply with a strip search.  I was held in leg restraints, handcuffs, with the "Black Box" attached with chains to my leg chains for 42 [hours] and 28 minutes.  I understand that there are [sic] policy that dictate[s] how to treat a[n] [uncooperative] inmate … but 42 [hours] in the "Black Box" is [torture] and inhuman to a human being….  I claim deliberate indifference.  What I would like is the Black Box only to be used during transport, never to be used on a[n] inmate in a[n] in-cell restraint situation.  The nerve[s] in my hands were damaged and I don't have any feeling in my left hand.  I would like some type of medical therapy, and the pain [and] suffering I [endured] through that [whole] situation, through [torture] tactics, that should not be allowed to take place in a correctional institution.  I would like some kind of monetary settlement.  I wrote Warden Erfe, [Captain] Washington, and [Lieutenant] Conger.  They have not responded, but I wrote [Deputy] Warden Mulligan and he wrote back.  See attached request.  All these request[s] were dated the same day.

(ECF No. 59-4 at 44.)  Further evidence regarding the filing of this grievance and related papers, and the

response from the DOC officials, is discussed below in the analysis of Defendants' exhaustion

argument.

## III.   <u>Discussion</u>

        The plaintiff is proceeding on a claim of excessive force, state law claims of assault and battery,

and a claim for deliberate indifference to serious medical needs.  The plaintiff alleges that defendants

used excessive force on him by confining him in in-cell restraints for 42.5 hours for refusing a strip

search and also challenges the general practice of using in-cell restraints for inmates who refuse to

participate in a strip search.  The plaintiff also asserts state law claims for assault and battery against

defendants Norfleet and Ruggiero.  Finally, the plaintiff alleges that defendants Clapper, Norfleet, and Ruggiero were deliberately indifferent to his serious medical needs for failing to loosen the restraints, causing him to suffer radial nerve damage.

The defendants move for summary judgment on two grounds.  First, the defendants argue that the plaintiff failed to exhaust his administrative remedies before commencing this action.  Second, they contend that he has failed to present evidence of a violation of the Constitution or state law.

A.      *Exhaustion of Administrative Remedies*

Although the defendants do not dispute that the plaintiff filed the grievance quoted above, they argue that he failed to do so in compliance with applicable grievance procedures and, specifically, that he failed to make a timely attempt to resolve the dispute informally in writing before filing the grievance, as required by DOC grievance procedures.  As a result, the Defendants argue, the exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (the "PLRA"), bars the plaintiff's claims.

The PLRA requires inmates to exhaust available administrative remedies before filing an action in federal court concerning any aspect of prison life.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  An inmate must exhaust any such remedies, regardless of whether they provide the relief the inmate seeks.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001).  A claim is not exhausted until the inmate complies with all administrative deadlines and procedures.  *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement.  *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).  If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court.  *See Woodford*, 548 U.S. at 95.  In addition, the inmate must exhaust his administrative remedies for each claim he asserts in federal court.  *See*

9

*Baldwin v. Arnone*, No. 3:12cv243(JCH), 2013 WL 628660, at *5 (D. Conn. Feb. 18, 2013).

An inmate may be excused from the exhaustion requirement only if administrative remedies were not in fact available. *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016). The Supreme Court has identified three circumstances where an administrative remedy, although officially available, cannot be used by inmates to obtain relief. *Id.* at 1859. First, the administrative remedy may operate as a "dead end," such as where the office to which inmates are directed to submit all grievances disclaims the ability to consider them. *Id.* Second, the procedures may be so confusing that no ordinary prisoner could be expected to "discern or navigate" the requirements. *Id.* And third, prison officials may "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The Department of Correction grievance procedures are set forth in Administrative Directive 9.6. (*See* Defs.' Mem. Ex. F, ECF No. 59-8.) The procedures require an inmate first to seek informal resolution of the issue in writing, using an Inmate Request Form. The appropriate correctional official has fifteen days to respond to the Inmate Request. If the inmate is not satisfied with the response, the inmate must file a grievance and attach the Inmate Request Form containing the response. The inmate must file the grievance within thirty days of the date of the cause of the grievance. The Unit Administrator has thirty days to respond to the grievance. If the inmate is not satisfied with the response, or no response is provided within the thirty days, the inmate may file a grievance appeal.

Although *Blake* does not suggest that an inmate's awareness of grievance procedures is a prerequisite to finding a failure to exhaust, in this case the undisputed evidence shows that the plaintiff was aware of the grievance procedures. Before filing this lawsuit, he attended inmate orientation at various correctional facilities and received handbooks describing the administrative remedy procedures

– as he acknowledged in his deposition.  (ECF No. 59-4 at 10-12.).  Further, the plaintiff has not identified any person who prevented or interfered with his filing the grievance and has alleged no facts to invoke any of the exceptions identified in *Ross*.  There is thus no doubt that the plaintiff was required to comply with the grievance procedures set forth in Administrative Directive 9.6.

Defendants argue that the plaintiff failed to do so, asserting that he filed his grievance in violation of the rule requiring him to attach to his grievance his Inmate Request Form, Form CN 9601, showing that he had attempted informal resolution of the dispute or to explain why that form was not attached.  After resolving all ambiguities and drawing all inferences in the record in favor of the plaintiff, however, the Court finds that a reasonable juror could find that he properly exhausted his administrative remedies as to some of his claims.  First, there is evidence in the record to support the plaintiff's claim that he did not actually file his grievance, which, as noted, is dated November 22, 2014, until December 10, 2014; this timing, taken together with the facts discussed below, suggests that he complied with the rule requiring informal resolution of the dispute before filing the grievance.  (ECF No. 1 at 22; *see also id.* at 9 ¶ 44.)  The text of the grievance provides support for this interpretation of the record.  It asserts that the plaintiff "wrote to" Warden Erfe and other Corrigan officials, that they had not responded, and that he also "wrote [Deputy] Warden Mulligan," an official at Northern Correctional Institution who "wrote back."   (ECF No. 59-4 at 44.)  The record includes evidence that Deputy Warden Mulligan did indeed "wr[i]te back" – by filling out the response portion of an Inmate Request Form, Form CN 9601, on December 5, 2014, which is after the November 22 date shown on the grievance but before the December 10 date the plaintiff contends he actually filed the grievance.  (ECF No. 59-4 at 48.)  The plaintiff's comment in his grievance that Mulligan had "wr[itten] back" supports the plaintiff's claim that the grievance was not filed (and not wholly filled out by the plaintiff) until

11

December 10.  The plaintiff's portion of the Inmate Request Form, which is dated December 2, 2014,

includes essentially the same complaint set forth in the grievance and quoted above.  (Id.)  The Inmate

Request Form also includes Deputy Warden Mulligan's response: "You are asking me to comment or

change policy at another facility that is beyond my jurisdiction" – which the Court interprets to mean

that the plaintiff was complaining about practices at Corrigan while he was housed at Northern.

The record also includes a separate Inmate Request Form dated December 2, 2014, and

addressed to Warden Erfe and other officials at Corrigan. (ECF No. 59-4 at 74.)  The plaintiff's portion

of that form sets forth essentially the same claim set forth in his grievance and also states: "I[] already

wrote you about this matter.  You did not respond.  This matter is not going away.  I have re-submitted

these request[s] to all the above, I am still waiting for a response."  (*Id*.)  The response portion of the

form is empty.  All this is consistent with the plaintiff's statement in his grievance that he "wrote to"

Erfe and other Corrigan officials and that they did not respond.

To be sure, the record as a whole does not unequivocally support the notion that the plaintiff

filed his grievance on December 10.  There is other evidence that the plaintiff filed his grievance on

November 22, 2014 (ECF No. 59-4 at 71), which would have made it impossible for him to have

attached Inmate Request Forms dated in December or otherwise to show – given the other evidence in

the record – that he had attempted an informal resolution of his complaint.   On summary judgment,

however, the Court is required to resolve this conflict in the plaintiff's favor, and when that is done, it is

apparent that he complied with the requirements of Administrative Directive 9.6.  That Directive

requires the inmate to file any grievance within 30 days of the "occurrence or discovery of the cause of

the grievance."  The plaintiff complied with this deadline by filing a grievance on December 10 to

complain about his confinement in in-cell restraints from November 12 through November 14.  With

regard to the requirement of first seeking informal resolution in writing, the Directive states as follows:

"The inmate shall attach CN 9601, Inmate Request Form, containing the appropriate staff member's response, to the CN 9602, Inmate Administrative Remedy Form [i.e., the grievance form].  If the inmate was unable to obtain a blank CN 9601 ... or did not receive a timely response to the inmate request, or for a similar valid reason, the inmate shall include an explanation indicating why CN 9601 ... is not attached....."    The text of plaintiff's grievance suggests that it did attach the Inmate Request Forms, Forms CN9601 – both the one showing Mulligan's response and the one sent to Erfe and other Corrigan officials showing no response.  (ECF No. 59-4 at 44 ("I wrote Warden Erfe ....  They have not responded.  I wrote D[eputy] Warden Mulligan and he wrote back.  *See attached request.  All these Request[s] were dated the same day.*") (emphasis added)).[3]  Admittedly, Mulligan was probably not an "appropriate staff member" within the meaning of the Directive – because he did not work at the facility at which the events that were the subject of the grievance occurred – and the Inmate Request Form addressed to the Corrigan officials did not include their response.  But the text of the grievance, together with the plaintiff's statements on the Inmate Request Form addressed to the Corrigan officials that he had made previous requests, constitute sufficient evidence for a reasonable juror to find that the plaintiff "did not receive a timely response to the inmate request" and thus that he complied with the requirements of the Directive.[4]

---

[3] In the exhibits attached to Plaintiff's original complaint, the Inmate Request Form with Mulligan's response *was* attached to the first page of the grievance – although the second page of the grievance, which set forth the text of the complaint, was missing.  (*See* ECF No. 1 at 22-23.)  The Inmate Request form addressed to Erfe and others at Corrigan – showing no response – was also included in the exhibits filed with the original complaint, albeit not adjacent to the grievance.  (ECF No. 1 at 29.)

[4] This is so even though the inmate request form addressed to the Corrigan officials is dated December 2, 2014, and under the Directive those officials had fifteen days to respond.  The plaintiff's portion of the form indicates that he made earlier requests to which those officials did not respond, and there is in any event no evidence that

A reasonable juror could find exhaustion, however, only with respect to those of the plaintiff's claims in this action that he actually asserted in the grievance.  *See, e.g., Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (finding exhaustion as to due process claim but not as to Eighth Amendment claim).  The plaintiff's grievance makes no mention of any defendants checking on and refusing to loosen the restraints, his inability to feed himself or see to his bodily functions, or deliberate indifference to any need for medical care.  The plaintiff has thus exhausted his administrative remedies only as to his excessive force claim and state law assault and battery claims, all of which are based on his confinement in in-cell restraints, including the black box.  The defendants' motion for summary judgment is granted on failure-to-exhaust grounds as to all remaining claims, including the claim for deliberate indifference to serious medical needs, any claims regarding any activities while the plaintiff was restrained, including any refusal to loosen the restraints, and any challenges to the strip search procedure itself – including the requirement that he bend at the waist and spread his buttocks to allow for a visual inspection of the rectum.[5]

---

the Corrigan officials responded at the close of the fifteen-day period – December 17.  Further, a reasonable juror could find that the plaintiff's transfer to Northern immediately following the events giving rise to his grievance hindered his ability to submit a timely Inmate Request Form – and to receive a timely response – and thereby constitutes "a similar valid reason" for not submitting with his grievance an Inmate Request Form from an "appropriate official" under the Directive.  Finally, although the record also includes later inmate request forms containing responses from the Corrigan officials in which they assert that these later requests were the first they received, I need not credit those statements on summary judgment.

[5] In his opposition memorandum, the plaintiff contends that the search was conducted before several male officers and one female officer and also that it was videotaped.  These claims were neither exhausted nor included in the complaint and cannot be added to the case via a memorandum.  *See Wright v. Ersnt & Young, LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (plaintiff cannot amend complaint in a memorandum); *August v. Department of Corrections*, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (same); *Heletsi v. Lufthansa German Airlines, Inc.*, No. 99-CV-4793(SJ), 2001 WL 1646518, at *1 n.1 (E.D.N.Y. Dec. 18, 2001) (disregarding new allegation of fact raised in opposing memorandum; noting that "[a] party cannot amend their complaint simply by alleging new facts and theories in their memoranda opposing summary judgment.").  In any event, the Court has reviewed the videotape, which does not show the plaintiff below the waist and shows that the female officer, Lieutenant Champion, left the cell while the plaintiff was unclothed.  (Defs.' Mem., ECF No. 59, Ex. D.)

B.    *Excessive Force*

Defendants also seek summary judgment on the plaintiff's excessive force and assault and battery claims.  They argue that use of in-cell restraints with the black box to compel compliance with a strip search is reasonably related to maintaining prison security and that, although the restraints were applied to the plaintiff for an extended period, he was appropriately monitored and offered opportunities to end the application of force by complying with the strip search.  As the Court noted in the initial review order (ECF No. 8 at 8), the excessive force claim can be construed as presenting both a facial and an as-applied challenge to the plaintiff's confinement in  restraints, i.e., that: (1) the practice of using the black box with in-cell restraints to gain compliance with a strip search is unconstitutional, and (2) in the circumstances of this case, placing the plaintiff in in-cell restraints, including the "black box," for 42.5 hours for refusing to submit to a strip search was unconstitutional.  The Court agrees with the defendants that there is no genuine dispute of material fact and they are entitled to judgment as a matter of law with respect to the facial challenge to the use of in-cell restraints, including the black box, to gain compliance with lawful orders, including the strip search procedure involved here.  The Court finds, however, that there are genuine disputes of material fact that preclude summary judgment regarding the application of the in-cell restraints to the plaintiff in this case.

The use of excessive force against a prisoner can constitute cruel and unusual punishment even where the inmate does not suffer serious injuries.  *See Hudson v. McMillian*, 503 U.S. 1, 4 (1992), *accord Wilkins v. Gaddy*, 559 U.S. 34, 34, 36 (2010) (per curiam).  The "core judicial inquiry" is "not whether a certain quantum of injury was sustained but rather whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7 (internal quotation marks omitted).  There are objective and

subjective components to the excessive force standard.  *Hudson*, 503 U.S. at 8.  Objectively, the court must consider the level of force used against the inmate and determine whether that force is repugnant to the conscience of mankind. *Id.* at 9-10.  Subjectively, the court must determine whether the defendants had a "wanton" state of mind when applying the force.  *Id.* at 8.

The extent of the inmate's injuries is one factor the court may use to determine whether correctional staff could "plausibly" have considered the force necessary in a particular situation.  *Id.* at 7.  Other factors include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  *Id.* (internal quotation marks and citation omitted).

Maintaining order and security in a prison is a legitimate penological objective.  Thus, the use of restraints that are reasonably related to maintaining prison order and security, without more, does not violate the Eighth Amendment.  *See Dolphin v. Manson*, 636 F. Supp. 229, 234 (D. Conn. 1986) (citing *Bell v. Wolfish*, 442 U.S. 520, 540 (1979)).  When considering claims relating to the use of restraints, courts consider the circumstances surrounding use of the restraints, including both the length of time the restraints were applied and the objective sought to be achieved through their use.  *See Alston v. Butkiewicus*, No. 3:09-cv-207(CSH), 2012 WL 6093887, at *11 (D. Conn. Dec. 7, 2012).

DOC Administrative Directive 6.5 permits supervisors to use in-cell restraints to ensure compliance with an order and to maintain prison order, safety, and security.  *See* Directive 6.5, Section 8(A)(4).  Here, the plaintiff refused to comply with a strip search order.  While he disagreed with the manner in which the defendants proposed to conduct the strip search, the U.S. Supreme Court has upheld the use of the "bend and spread" form of strip search by prison officials.  *Bell v. Wolfish*, 441 U.S. 520, 558 n.39 & 560-61 (1979) (upholding, against Fourth Amendment and Due Process

challenges, strip search whereby inmate was naked and required to bend at waist and spread buttocks).

Because the plaintiff thus had no legal basis to resist the defendants' lawful order, the use of in-cell

restraints was warranted under the directive.

The plaintiff argues that the defendants could have elected to perform a hands-on controlled strip

search instead of using in-cell restraints.  It is not excessive force, however, for the defendants to choose

between two lawful force options, and the defendants here reasonably chose one that involved less

"hands-on" force.   The defendants have provided an affidavit of District Administrator Peter Murphy

stating that a controlled, hands-on strip search, during which the inmate's legs are forced apart to expose

his rectum and genitalia, can result in an explosive situation, exposing staff to possible injury.  (*See*

Defs.' Mem. Ex. I, ECF No. 59-11, ¶ 6.)  District Administrator Murphy also states that if an inmate is

permitted to go to restrictive housing without first being strip searched, the inmate may bring with him

contraband secreted in his rectum.  Contraband might include drugs, a weapon, or handcuff keys.

During his career, District Administrator Murphy has seen this happen numerous times.  *Id.* at ¶ 7.  With

the black box applied to the handcuffs, it would be more difficult for an inmate to retrieve items from his

rectum.  Even if the inmate were able to retrieve a handcuff key, he would be unable to unlock his

handcuffs as the lock is covered by the black box.  *Id.* at ¶ 8.  The plaintiff has submitted no admissible

evidence contradicting this evidence.

The defendants have presented evidence showing the threat reasonably perceived by correctional

staff when an inmate refused to undergo a strip search after involvement in a significant incident, the

need for application of force, and a relationship between the need and amount of force used.  Although

application of in-cell restraints would last longer than a hands-on controlled strip search, use of in-cell

restraints posed a lower risk of injury to staff and the inmate.  In addition, the defendants have provided

the affidavit of Dr. Johnny Wu stating that properly adjusted in-cell restraints with a black box will not cause injury.  (Defs.' Mem. Ex. K, ECF No. 59-13, ¶ 5.)  I conclude that the policy of utilizing in-cell restraints when an inmate refuses a lawful order to undergo a strip search does not constitute the use of excessive force.  The defendants' motion for summary judgment is granted as to the facial challenge to this policy.

The remaining federal claim is whether the application of in-cell restraints to the plaintiff under the circumstances of this case constituted the use of excessive force.  "There is consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lozada v. City of New York*, No. 12 Civ. 0038(ILG)(JMA), 2013 WL 3934998, at *5 (S.D.N.Y. July 29, 2013) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (collecting cases)) (internal quotation marks omitted).  Plaintiff alleges that he suffered permanent radial nerve damage to his left hand causing loss of feeling in his thumb and first two fingers (Am. Compl., ECF No. 32, ¶ 39-42), and has filed copies of his medical records documenting the diagnosis.  (*Id.* Ex. 35-36.)  The defendants have not filed any contrary evidence.  Injury causing permanent nerve damage is more than *de minimis* and applying handcuffs so tightly as to cause such injury is repugnant to the conscience of mankind.  Thus, the plaintiff satisfies the objective component of the excessive force standard.

The plaintiff also must demonstrate that the defendants acted with a sufficiently culpable state of mind.  The plaintiff's refusal to submit to a body cavity search lends credence to the possibility that he was hiding something in his rectum.  On the other hand, there is no evidence in the record showing that, after it became clear that the use of in-cell restraints was not gaining the plaintiff's compliance with the strip search order, the defendants ever revisited the option of a hands-on search or otherwise considered

other mechanisms to achieve their lawful objectives – short of leaving the plaintiff in a highly restricted position for 42.5 hours.  The video shows that the plaintiff was not agitated or resisting the officers in any way, and, when the plaintiff was released from in-cell restraints after 42.5 hours, he was not strip searched before being transferred to Northern Correctional Institution.   (Pl.'s Declaration, ECF No. 64-1, ¶ 14.)  The video shows that the black box was removed in the Admitting and Processing room and not reapplied.  (Defs.' Mem., ECF No. 59, Ex. D.)  Plaintiff argues that the fact that he was not strip searched before transfer calls into question the defendants' contention that application of in-cell restraints was necessary to ensure institutional safety and security and shows that the defendants intended to punish him by application of the in-cell restraints.

The Court concludes that there are triable issues regarding the reason for plaintiff's placement on in-cell restraints and the duration of the in-cell restraints.  Resolution of this question requires an assessment of the parties' credibility, which cannot be done on a motion for summary judgment.  The defendants' motion for summary judgment is denied on this claim, and as to the related assault and battery claims.

C.   *Remaining Defendants*

There remains the question of which defendants the remaining excessive force and assault and battery claims actually target.  This is not a straightforward question in this case, as the complaint is ambiguous about which defendants were allegedly responsible for particular acts. The "Claims for Relief" section of the complaint lists Erfe, Marten, Williams, Champion, Conger, Norfleet, and Ruggerio as being responsible for the application of the "black box applied with the handcuffs without need or provocation" and for "the tort of assault and battery."  (ECF No. 1 at 12 ¶ 66.)   But the complaint does not plead any facts suggesting that Erfe, Marten, or Williams were actually involved in

any of the decisions to apply force to the plaintiff – other than the decision to approve the policy of using in-cell restraints including the black box on inmates who resist orders, a decision as to which the Court has granted summary judgment to defendants.  (*See* ECF No. 1 at  ¶ 65.)  Upon reflection, the Court's earlier orders are also – admittedly – less than clear on this point, as they suggest – incorrectly – that only defendants Norfleet and Ruggerio were involved in the actual application of force to the plaintiff.  (ECF No. 8 at 8; ECF No. 62 at 6.)  The summary judgment record shows that Defendants Champion and Conger were also dealing directly with the plaintiff and may have had some involvement in the decision to keep him in restraints for 42.5 hours.  In his deposition, the plaintiff testified that he was suing Erfe, Martin, and Williams because they were "in charge of the whole policy set up, that they apply this black box in the first place."  (ECF No. 59-4 at 25 (describing the plaintiff's reason for suing Erfe); *see also id.* (as to Martin: "He is in the same situation….") and *id.* (as to Williams: "Captain Williams is in the same boat as the other two …."].)  The plaintiff offered no other reason for suing those three defendants and, as noted, the Court has granted summary judgment as to the facial challenge to the use of in-cell restraints, including the black box, to compel compliance with orders.

After construing the pleadings and record liberally in favor of the pro se plaintiff, it appears that the remaining defendants are Norfleet, Ruggerio, Conger, and Champion.  As noted, this conclusion arguably contradicts earlier suggestions by the Court that only Norfleet and Ruggerio were defendants on the as-applied challenge to the plaintiff's confinement in in-cell restraints.  Thus, when the motion for summary judgment was filed, Defendants Conger and Champion may have assumed that they were no longer defendants as to the as-applied excessive force claim and did not need to respond to that claim. In fairness to defendants Conger and Champion, then, the Court will allow those defendants – and those defendants only – to file a second motion for summary judgment as to a single issue, that is, the issue of

20

their personal involvement in the conduct surround the remaining, as-applied excessive force claim.

Specifically, within sixty days of this order, should they believe there is a basis to do so, defendants

Conger and Champion may file a motion for summary judgment attempting to show that there is no

genuine dispute as to a material fact that they were not personally involved in the conduct that forms the

basis of the as-applied excessive force claim.  If defense counsel concludes there is no basis for filing

such a motion – or otherwise chooses not to file such a motion for any reason – he shall file a statement

on the docket within forty-five days of this order notifying the plaintiff and the Court of his decision not

to file the motion for summary judgment described in this paragraph.

## IV.     **Conclusion**

The defendants' motion for summary judgment [Doc. #59] is GRANTED as to claims except the

excessive force claim and assault and battery claims against defendants Norfleet, Ruggiero, Champion,

and Conger regarding the application of in-cell restraints to the plaintiff.  Within sixty days of this order,

defendants Champion and Conger may file a motion for summary judgment as to the issue of their

personal involvement, as described above.  If they determine not to file such a motion, they shall file a

statement so indicating within forty-five days of the date of this order.  The Court is unlikely to extend

these deadlines.

All remaining deadlines in the case are adjusted as follows.  If Defendants Conger and Champion

file a second motion for summary judgment, then the joint trial memorandum will be due within 45 days

of the Court's ruling on that motion.  If not, the joint trial memorandum will be due within 45 days of

the filing by defense counsel of the statement indicating that he does not intend to file another summary

judgment motion.

The Court will suspend these deadlines if the parties jointly indicate they wish to proceed to

mediation with a magistrate judge.  Should they wish to do so at this juncture, the parties shall, within 21

days of this order, file a joint statement certifying that (1) the parties have conferred with each other

(through counsel, in the case of the defendants), (2) the parties wish to proceed to mediation, (3) the

parties are willing to participate in settlement efforts at such mediation in good faith, and (4) the parties

and counsel believe that a mediation stands at least a reasonable chance of resolving the case without

trial.  The Court will then refer the case for mediation before the Honorable Magistrate Judge Martinez.

SO ORDERED.

Signed this 4th day of January 2016 at Hartford, Connecticut.


_____/s/_____
Michael P. Shea
United States District Judge